**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| RESOUND STRUCTURED HOLDINGS, LLC; | No. 3:22-CV-01877-S |
| Plaintiff. | |
| v. | **JURY DEMAND** |
| SMART CONTRACT SOLUTIONS, LTD and VERLIN SANCIANGCO, | |
| Defendants. | |

## FIRST AMENDED COMPLAINT

COMES NOW, Plaintiff RESOUND STRUCTURED HOLDINGS, LLC ("Plaintiff"), by and through counsel, pursuant to this Court's Order (Doc. 11), and hereby files this its First Amended Complaint against Defendants SMART CONTRACT SOLUTIONS, LTD and VERLIN SANCIANGCO (collectively, "Defendants"), and states as follows:

## INTRODUCTION

1.      This is an action against Smart Contract Solutions, LTD and Verlin Sanciangco for Breach of Contract, Fraud, Non-disclosure Fraud, Conversion, Violations of the Texas Deceptive Trade Practices Act, and Negligent Misrepresentation, and Defendants knowingly, intentionally, and willfully used false statements and withheld information in order to solicit the business and funds of the Plaintiff.

2.      Defendant Sanciangco created a false image of himself, one where he had a flashy, expensive lifestyle and conducted business in places like Dubai and London. He used

this manufactured image to induce Plaintiffs to enter into a business relationship wherein they would not only invest, but use their vast business knowledge, experience, and list of contacts to find additional investors.

3.      Defendants used the perception of cryptocurrency as being new and exciting to induce investments, they then used the complicated nature of cryptocurrency exchanges to hide their bad actions. The complicated nature of cryptocurrencies made the deception easier and when questions were raised by Plaintiff Defendants were able to provide vague assurances in order to keep the scheme going.

4.      Once Defendants were exposed, they stopped paying fees and payments, moved the crypto coins to unknown locations, and eventually stopped all communications while refusing to honor their contracts.

## **PARTIES**

5.      Plaintiff Resound Structured Holdings, LLC (sometimes "RSH" ) is a Texas limited liability company with its primary place of business located at 408 Water Street, Waxahachie, TX 76065.

6.      Resound Structured Holdings LLC wholly owns Resound Structured Capital LLC ("RSC"). Christopher Conant is the sole manager of each and is a citizen of Texas.

7.      Each of the members of RSH is a citizen of a state separate from either of the Defendants in this matter. The members of RSH and their citizenship is:

    a.  Laguna Coast Holdings LLC is a Texas Domestic Limited-Liability Company
        with its primary place of business located at 408 Water Street, Waxahachie,
        Texas, 76065. Laguna Coast Holdings LLC's sole member is Christopher Conant

        i.  Christopher Conant is a citizen of Texas.

b.  Christopher Makridis is a citzen of the State of Texas.

c.  Brian and Jane VanderPloeg are citizens of the State of Oregon.

d.  Tony Tompkins is a citizen of the State of Florida.

e.  Barham & Maucere LLC is a Tennessee Limited Liability Company with its primary place of business located at 7209 Hayley Industrial Drive, Suite 210, Nolensville, Tennessee, 37135.

8.  Defendant Smart Contract Solutions, LTD ("SCS") is a London United Kingdom limited company Registration No. 12844085, with its primary place of business located at 71-75 Shelton Street, Covent Garden, London WC2H 9JQ, United Kingdom. SCS may be served in the United States through its principal, Verlin Sanciangco, at 11240 Pioneer Ridge Rd. Moreno Valley, CA 9255. SCS has no business operations located in the State of Texas.

9.  Defendant Verlin Sanciangco ("Sanciangco"), upon information and belief, is a citizen of the state of California and may be served at: 11240 Pioneer Ridge Rd. Moreno Valley, CA 9255 or wherever he may be found.

10.  Upon information and belief, SCS is the alter ego of Sanciangco. Upon information and belief, Sanciangco, as the sole principal of SCS, has ignored the corporate form, commingled accounts, and funds, and has acted fraudulently by and through SCS.[1]

## JURISDICTION AND VENUE

11.  Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds the $75,000.00 threshold and there is complete diversity of citizenship of the parties.

---

[1] The Alter Ego Theory exists where a corporation (1) is organized and operated as a mere tool or business conduit of another; and (2) there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation or individual liable would result in injustice. (Castleberry v. Branscum, 721 S.W.2d 270 (Tex. 1986)).

12.     Defendants have not registered to conduct business in Texas. This Court has personal jurisdiction over Defendants because Defendants have conducted business and/or signed contracts in Texas. Defendant SCS has a registered office in London United Kingdom and Verlin Sanciangco is a resident of Moreno Valley, California.

13.     Venue lies within this judicial circuit pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred herein. "Contract jurisdiction" has been agreed to be located in Ellis County, Texas. (Memorandum of Understanding v4, para. 9(f)). Due to the intangible nature of Ethereum, cryptocurrency, liquidity pools, money transfers, venue is proper where the Plaintiff RSH is located and all of its banking and financial transactions were carried out.

14.     Diversity jurisdiction is proper because no Plaintiff or member of Plaintiff LLC shares citizenship with any Defendant.

15.     Jurisdiction and venue are proper for each claim asserted in this complaint.

### **FACTS**

16.     Plaintiff RSH is a Texas limited liability company that holds cryptocurrency assets and provides related consulting services.

17.     RSH wholly owns Resound Structured Capital. At all times relative to the facts of this complaint, Christopher Conant was acting on behalf of Plaintiff RSH in his scope of management duties of RSH and as an agent of RSH and RSC.

18.     RSH and RSC are each headquartered, located, and operated in Waxahachie, TX, in the Northern District of Texas.

19.     In the Spring of 2021, Conant was introduced to Defendant Sanciangco through a mutual business acquaintance.

20.     Upon information and belief, Sanciangco operates out of various places in the world, including Dubai, UAE, London, UK, and the State of California.

21.     Sanciangco represented to Conant that he had connections with a high-net-worth international family investment office, the "Ruby Family Office".

22.     Sanciangco informed Conant that he operated one or more cryptocurrency "liquidity pools" through a London UK limited company, Defendant SCS.

23.     Cryptocurrency liquidity pools exist to provide the currency needed to facilitate cryptocurrency traders and participants to exchange one form of cryptocurrency for another, akin to liquidity requirements at  traditional currency exchanges.

24.     Liquidity pools operate by holding a pool of liquid assets in the form of cryptocurrency pairs. When an owner of cryptocurrency wishes to exchange one currency for another on a decentralized exchange, the liquidity pool operator provides the paired crypto assets in exchange for a fee (often approximately .3%) per transaction. The operator makes money by generating the exchange fees, less crypto "gas fees," other fees, and operating expenses.

25.     In order to operate the liquidity pool, the operator requires cryptocurrency. Most pool operators use their own currency. In the case of SCS (the pool operator), Sanciangco engaged persons who transfer their cryptocurrency to wallets that were used to stake the liquidity requirements in a liquidity pool. The persons staking the liquidity pools are referred to as liquidity partners  ("Liquidity Partners" or "LPs"). The LP would receive a fee on the staked cryptocurrency in the form of a percentage of the pool operator's weekly generated fees. Sometimes this fee is expressed as a specific amount of return per transaction period (i.e., a 2.25% percentage paid out weekly).

26.    Upon information and belief, Defendants operated one or more liquidity pools (collectively "Pool") and engaged Plaintiff to provide the following services to Defendants: a) introduce new Liquidity Partners to Defendants through Plaintiff's extensive private network of individuals and entities; and b) provide educational and other consulting services to the Limited Partners. Plaintiff would introduce new Liquidity Partners directly and through subcontractors. Plaintiff's private network of Liquidity Partners was protected, in part, by  introduce  Plaintiff's Subcontractor's NDA and Non-circumvent Agreement. SCS would pay Plaintiff a fee or in cryptocurrency for introductions and other services performed on  those who remained in SCSs liquidity pool. ("Scheme").

27.    In or about June 2021, Defendants solicited and induced Plaintiff to stake its own cryptocurrency asset in SCS by providing value to Defendants in the form of ETH.

28.    Sanciangco made certain representations on behalf of SCS to Conant and RSH.

29.    Specifically, and particularly, Defendants made the following material representations:

    a.    Defendants represented to Conant and RSH that Sanciangco was running a liquidity pool through SCS.

    b.    Sanciangco represented that the liquidity pool had specific features, including a pool that exchanged US Dollar Coin (a "stable" cryptocurrency tied to the value of the US Dollar) ("USDC") and Ethereum (a popular and liquid cryptocurrency) ("ETH").

    c.    Defendants represented that the LPs crypto would be held in various and specific wallets (cryptocurrency-holding accounts) in which Defendants were holding

Page 6

LPs' crypto, that was not supposed to change without Plaintiff's knowledge and consent.

d. Defendants represented and made assurances regarding how the funds would be held.

e. Defendants represented that for every US dollar worth of Ethereum crypto placed in the Pool by LPs, the Ruby Family Office would match with an additional three (3) US dollars' worth of liquidity into the pool as a measure to hedge against risk.

f. Defendants represented that investors, including Plaintiff, could withdraw its crypto upon demand, which would be honored, and funds would be settled out into the wallet of investors' choosing within 24 hours. (MOU, para 5).

g. Defendants represented that it would pay a fee, in cryptocurrency, for LPs that signed up under the RSH code.

h. Defendant represented that it would not circumvent the relationship established by RSH or its subcontractors. (NONCOMPETE, para 6).

30.    On June 28, 2021, Plaintiff, through related entity RSC, entered into a "Memorandum of Understanding v.4" with Defendants ("MOU") (Attached hereto as Exhibit A). While called a memorandum of understanding, the MOU contained all of the necessary elements to be a binding contract and was treated by all the parties as a valid and binding contract.

31.    RSC assigned its rights under the MOU to Plaintiff RSH in its "First Amendment to Memorandum of Understanding v.4 executed June 28, 2021" ("Amendment 1," attached hereto as Exhibit B)[2].

---

[2] References to the rights and obligations of "RSC" in the agreement were assigned to "RSH" and are used interchangeably herein.

32. Plaintiff and SCS executed two additional amendments to the Agreement, (attached hereto as Exhibit C and D) (Collectively, the MOU and each of the amendments together, "Agreement")

33. The Agreement contained, *inter alia*, the following material terms:

a. The Parties to the Agreement would designate three different account types: Management Accounts, Business Accounts, and Personal Accounts. (MOU, para 1(c)).

b. Business Accounts were any RSH- originated and Subcontractor-introduced Liquidity Partner from Plaintiff's private network. Plaintiff was reputation-bound but not fiduciary bound to manage the LPs.

c. In exchange for its services, Plaintiff would receive an average fee of 2.5% of cryptocurrency in the Pool's wallets paid every seven days (MOU, para 1).

d. SCS was required to do everything possible to prevent any fraud or illegality through the support and set-up of legal structures, bank accounts or crypto wallets, and was required to maintain proper documentation and transparency to properly sign-on any liquidity partners. (MOU, para 3(a)).

e. SCS was required to provide disclosure of certain historical financial documents pertaining to commissions, LP staking and reporting. (MOU, para 3(b)).

f. The Agreement further provided that "In the event the ETH is hacked, lost or otherwise and/or maliciously disappeared following the meta mask transfer to SCS wallet and until it safely returns, then SCS guarantees the safe return of the original liquidity amount from the previous week." (MOU, para 3(n)).

g. SCS agreed to "guarantee the protection and security of the LP's funds and profit with full liability in accordance with the law of any local and international jurisdiction." (MOU, para 3(q)).

h. Importantly, SCS agreed to use two unchangeable wallets, the "LP Wallet" and the "ARK Wallet." (MOU, para 3(s)). The Agreement provided that "at no time will excess fees be skimmed or transferred away to any other wallet except that SCS wallet ending in -88a98 that is specifically used for wrapping the pairs and placing into the Uniswap liquidity pool. If this wallet changes, SCS must convey in writing to RSH prior to changing." (MOU, para 3(s)).

i. The Agreement allowed RSH and any Liquidity Partners introductions to withdraw their ETH anytime. SCS was required to process the ETH withdrawal to RSC within 24 hours from the time the email notification is received. (MOU, para 5).

j. SCS warrantied that "SCS has no criminal record, has never been involved in any personal or corporate bankruptcy, has never been investigated by any tax authority, that the process of payout in USDC of ETH is not, whether directly or indirectly, the proceeds of any criminal activity, ponzi scheme, or HYIP deception." (MOU, para 9). Failure by SCS in representation or warrant is considered a breach of this agreement.

34. The Agreement had a stipulated liquidation value of at least Five Million US Dollars ($5,000,000). (MOU, para 18). Despite this, Plaintiff has already placed over $8M worth of ETH to Defendants from its private network.

35.    Plaintiff performed customary and ongoing due diligence prior to signing the Agreement and thereafter, including extensive conversations with Sanciangco and others, review of available documentation, and research into liquidity pools.

36.    Plaintiff reasonably relied completely on the statements and representations and omissions made by Defendants in entering into the Agreement and placing cryptocurrency into the Scheme.

37.    Plaintiff (RSH) re-staked its weekly fees and combined with cryptocurrency capital directly committed from June 2021 to March 2022, the fees totaled approximately 200 ETH with a total value as of March 2022 of Six Hundred and Sixty Thousand USD ($660,000).

38.    Plaintiff performed its duties under the Agreement and provided services to Defendant by providing introduction and support services to multiple liquidity partners, who, upon information and belief, placed money into Defendants' Scheme.

39.    After Plaintiff had placed money in the Pool, Defendants made other material representations regarding the pool. Specifically, and particularly, Defendants made the following representations:

a.    Where crypto was being utilized and the exchanges and pools in which the investors' cryptocurrency was being used.

b.    The size, liquidity, and nature of the Liquidity Pool**.**

c.    Defendants identified specific wallets in which some of the cryptocurrency was being held.

d.    The number of LPs in the Pool and the total value of the crypto placed  into the Pool.

e.    The amount of crypto that was staked and matched by the Ruby Family Office and that the staking matched the 3:1 ratio as promised by Defendants.

    f.   The amount of actual returns on the crypto staked into the Pool.

    g.   That placements could be fully withdrawn at any time.

    h.   Wallets being used were only those in the contract.

    i.   That 10% of the proceeds were going to charity.

    j.   That no criminal, activity was in SCS or Sanciangco's past.

    k.   Sanciangco also specifically represented that an earlier disciplinary action regarding Sanciangco's real estate license had been resolved in full.

40.    At all times relevant to this Complaint, Plaintiff reasonably relied upon the statements of Defendants in placing crypto and restaking fees into the Pool and providing its services to Defendants for the liquidity partners.

41.    As a part of the Scheme, Defendants communicated regularly with Plaintiff through the internet and other electronic means, including email, zoom and text messages. As a primary part of the Scheme, Defendants used the internet to operate the Pool using Plaintiff and other LPs' money.

42.    Defendants operated the Pool and at first began to pay Plaintiff as indicated in the Agreement. Plaintiff received exchange fees on its placement and received fees averaging 2.5% in connection with introductions to liquidity partners and Plaintiff's services. At all times, Plaintiff provided its services and made introductions as required by the Agreement.

43.    Upon information and belief, the following specific representations of fact were untrue and were misrepresentations or material omissions made by Defendants:

    a.   In December 2021, Plaintiff discovered in a direct quote from Sanciangco that Defendants had given no proceeds to its own "Foundation" in 2021 as otherwise represented. In fact, the Foundation was not even corporately formed yet, and

representations of work by the Foundation came from testimonies supplied from Defendants.

b. In December 2021, Plaintiff inspected certain wallets and liquidity pools associated with the Agreement. Plaintiff discovered that the number of existing wallets and the amounts of cryptocurrency in the wallets was materially different than represented by Defendants. Additionally, upon inspection, the Pool was not as large as represented by Defendants.

c. Additionally, upon inspection of the wallets, Plaintiff discovered that the ratio of cryptocurrency staked by the Ruby Family Office did not equal 3:1 as represented by Defendants in a material amount. Upon information and belief, no agreement (written or otherwise) existed between Defendants and the Ruby Family Office to back investors with a ratio of 3:1.

d. On March 20, 2022, Plaintiff discovered that the real estate license issue had not been resolved, and in fact had resulted in criminal action against Defendant Sanciangco. Defendant Sanciangco plead guilty in October 2021 to fraud. However, Defendant Sanciangco failed to disclose this information to Plaintiff, or to any of its other liquidity partners, or acquisition directors.

e. The fact that Defendant Sanciangco was convicted of felony wire fraud and his failure to disclose the same to Plaintiff was an omission of a material fact.

36.     On March 21, 2022, Plaintiff confronted Sanciangco about his felony fraud conviction and other misrepresentations. Plaintiff communicated that "this information cannot be hidden and once disclosed, withdrawals will likely occur." Sanciangco assured Plaintiff that its network's withdrawals would not hurt the performance of the Pool. Plaintiff agreed to allow

Defendant ten (10) days to cure the misrepresentations before Plaintiff would communicate the issues to members of its network. However, Defendants failed to cure or explain any of the misrepresentations, threatened Plaintiff with legal action, and disparaged Plaintiff to its private network during the disclosure process.

37. Additionally, Defendants failed to fulfill material obligations that they had under the Agreement including but not limited to the following breaches:

    a.  Defendants circumvented non-competition and non-circumvention provisions under the Agreement by attempting to cut Plaintiff out of due commissions by offering "tokens" to Plaintiff's network of referrals, end-running around Plaintiff. (NONCOMPETE, para 6)). (Attached hereto as Exhibit E).

    b.  Since March 13, 2022, Defendants have failed to pay required weekly 2.5% Fee to Plaintiff. Plaintiff has not been able to withdraw its management account ETH and received no fees since March 13, 2022.

    c.  Defendant introduced and utilized new and different cryptocurrency wallets that Defendant could not view and had no access to.

    d.  Defendants failed to return Plaintiff's accumulated placed cryptocurrency after Plaintiff formally demanded the return of funds.

    e.  Upon information and belief, SCS's relationship with Ruby Family Office was either terminated or never existed and SCS failed to seek a replacement source for a source of cryptocurrency funds at 3:1 to de-risk the liquidity partner's investment and the ETH quantities were never returned to the rightful account holders. Upon information and belief, other larger ETH holders in SCS have not received their tokens as reported to Plaintiff.

    f.   Upon information and belief, Defendants transferred or moved many ETH quantities from the LP and ARK wallets into additional and/or unknown wallets.

    g.   Upon information and belief Defendants have skimmed or otherwise improperly stored and reported on all required amounts of cryptocurrency due to Plaintiff being held by wallets under the control of Defendants.

    h.   Defendants failed to allow Plaintiff and other liquidity partners to withdraw their cryptocurrency within 24 hours as required by the Agreement.

    i.   Since Phase Two has been successfully implemented by Plaintiff, it has failed to receive 50% of all Weekly Partnership Payout fees on direct placements since March 13, 2022.

    j.   Defendants have repeatedly failed to maintain proper documentation and transparency throughout the relationship.

    k.   Defendants have failed to provide full disclosure of all required financial data. In fact, virtually no information or data on financials have been provided at all.

    l.   Defendants have failed to ensure the safe and guaranteed return of weekly liquidity amounts and commissions.

38.    Plaintiff timely brought concerns regarding these breaches of the Agreement to Defendants and attempted to resolve these issues in good faith. However, Defendants stalled and failed to make any good faith efforts to fix these issues.

39.    By March of 2022, Plaintiff discovered that the Scheme was in trouble when Plaintiff discovered Sanciango's Felony Sentencing Memorandum from the United States District Court for the Central District of California, The sentencing document was regarding a two year sentence for incarceration set to begin on August 30, 2022.

40.     Defendants failed to pay Plaintiff's fees under the Agreement. When Plaintiff requested the return of its fees earned in the form of ETH, Defendants refused to pay Plaintiff the full amounts owed. Instead, Defendants began to disparage Plaintiff with lies and accusations of a scheme to hurt SCS.

41.     Defendants then attempted to improperly terminate the Agreement, keep the LPs from RSH's private network  for Defendants  without paying the due fees to Plaintiff in violation of the Noncompete/Non-circumvention Agreement and cut off all communications with Plaintiff.

42.     Upon information and belief, Defendants made multiple misrepresentations to Plaintiff and other Liquidity Partners and intended that Plaintiff rely on these misrepresentations.

43.     Plaintiff reasonably relied on the misrepresentations of Defendants in order to enter into the MOU Agreement and to continue to perform services pursuant to the Agreement. Plaintiff was induced into making its own placements and entering into the Agreement because of the false statements of Defendants.

44.     Plaintiff made demands for return of its placement and for a full payment of fees owed. Defendants have refused to pay the funds owed despite having control over said funds and being aware that Plaintiff has a legitimate ownership right over the funds which the Defendant has continued to profit from.

45.     Defendants began to disparage Plaintiff to Plaintiff's network and spoke to/called many Liquidity Partners which were within Plaintiff's network to reject that the sentencing was a certainty, to elicit questions from a group zoom call but mute those who began to probe into Defendant's hidden agendas, and he further solicited a circumvention to remain in the Pool with the intention to not pay RSH commission.

46.     Plaintiff has been damaged by the actions of Defendants in an amount to be proven at trial but at a minimum as set forth herein:

     a.  $5,000,000 in stipulated value due to the breach of the Agreement.

     b.  At least $4,400,000 in owed and unpaid fees.

     c.  General and compensatory damages due to Defendants' breaches and misrepresentations.

     Other damages as may be proven at trial.

## COUNT ONE
## BREACH OF CONTRACT

47.     Plaintiff reallege every allegation set forth in paragraphs 1 through 46 and incorporates those allegations by reference.

48.     A claim for Breach of Contract requires:

     a.  The existence of a valid contract;

     b.  The Plaintiffs performed their duties under the Agreement, tendered their performance, or else was excused from performance of the Agreement;

     c.  The Defendants breached the contract; and

     d.  The Plaintiffs were damaged as a result of the breach by the Defendants.

49.     The executed Memorandum of Understanding v.4, together with each of the Amendments to the Memorandum constitute a valid and executed contract between Plaintiff and Defendants ("Agreement").

50.     At all times Plaintiff performed all, or substantially all, their obligations under the Agreement and at no time was in breach of the Agreement.

51.     Defendants have breached multiple material terms of the Agreement as set forth more specifically in Paragraph 37.

52.     Defendants individually and jointly have breached their most basic contractual duty.  By refusing to provide an accounting, access to funds, and failure to remit past due payments, Defendants has rendered themselves useless and by doing so have severely damaged the Plaintiff.

53.     Further, Defendants have breached the Agreement by violating the covenant of good faith and fair dealing.  Defendants are liable for the losses of the Plaintiff that have resulted from their breaches of contract.

54.     The breaches by Defendants have proximately caused damage to Plaintiff by, *inter alia,* depriving Plaintiff of the fee to which it is owed.

55.     Plaintiff has suffered and continues to suffer significant damages as set forth fully and specifically in this Complaint.

## COUNT TWO
## FRAUD

56.     Plaintiff realleges every allegation set forth in paragraphs 1 through 55 and incorporates those allegations by reference.

57.     In Texas, the elements of common-law fraud are[3]:

   a.   That a material representation was made;

   b.    The representation was false;

   c.   When the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion;

   d.   The speaker made the representation with the intent that the other party should act upon it;

---

[3] See, e.g.,Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of America, 341 S.W.3d 323, 337(Tex. 2011);In re FirstMerit Bank, N.A., 52 S.W.3d 749, 758 (Tex. 2001);Trenholm v. Ratcliff,646S.W.2d 927, 930 (Tex. 1983);Casstevens v. Smith, 269 S.W.3d 222, 231 (Tex. App.Texarkana 2008); International Business Machines Corporation v. Lufkin Industries, LLC, 573S.W.3d 224, 228 (Tex. 2019).

      e.   The party acted in reliance on the representation; and

      f.   The party thereby suffered injury.

58.     Defendants made material representations to Plaintiff. Specifically, and particularly, Defendants made representations including but not limited to the statements listed above in paragraphs 29 and 39, which are incorporated herein as if fully stated[4].

59.     Each of these material representations were false.

60.     When each representation was made, Defendants knew that each representation was false or made it recklessly without any knowledge of the truth and as a positive assertion.

61.     Defendants made each representation with the intent that Plaintiff would rely and act upon it. Specifically, Defendants made the representations with the intent that Plaintiff would enter into the Agreement, perform services under the Agreement, place cryptocurrency with Defendants, attract other liquidity partners, vouch for Defendants, and otherwise maintain a business relationship with Defendants for Defendants' benefit.

62.     Plaintiff acted reasonably in reliance on each misrepresentation.

Plaintiff was seriously injured as a result of the misrepresentation to the extent as set forth in in paragraph 46  above.

## COUNT THREE
## NON-DISCLOSURE FRAUD

63.     Plaintiff reallege every allegation set forth in paragraphs 1 through 62 and incorporates those allegations by reference.

64.     In Texas, the elements of non-disclosure fraud are:

      a.   The Defendants fail to disclose a material fact within their knowledge;

---

[4] For purposes of maintaining a "short and plain statement of the claim" and to avoid unnecessary repetition, the statements recited in the facts are included here and in the other counts by reference.

    b.   The Defendants know that the Plaintiff is ignorant of the concealed fact and that the Plaintiffs do not have equal opportunity to discover the truth;

    c.   The Defendants intend to induce the other party to take some action by failing to disclose the concealed fact; and

    d.   The Plaintiff suffer an injury as a result of acting without knowledge of the disclosed fact. (*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 490 F. Supp. 2d 784 (S.D. Tex. 2007)).

65.    Defendants failed to disclose material facts to Plaintiff that were within the knowledge of Defendants. Specifically, and particularly, Defendants failed to disclose and concealed material facts including but not limited to the statements listed above in paragraphs 29 and 39, which are incorporated herein as if fully stated.

66.    Each of these material facts that Defendants failed to disclose were within their knowledge.

67.    Defendants knew or should have known that Plaintiff was ignorant of the concealed fact and that the Plaintiff did not have equal opportunity to discover the truth.

68.    The Defendants intended to induce the other party to take some action by failing to disclose the concealed fact. Specifically, Defendants concealed material facts – including, *inter alia,* Sanciangco's criminal indictment conviction, the amounts of crypto under control of the wallets, and the location of the cryptocurrency – with the intent that Plaintiff would enter into the Agreement, perform services under the Agreement, place cryptocurrency with Defendants, attract other liquidity partners, vouch for Defendants, and otherwise maintain a business relationship with Defendants for Defendants' benefit. Additionally, and critically, the

concealments occurred to prevent Plaintiff from disclosing the truth to Plaintiff's network of liquidity partners and to prevent Plaintiff from pulling out of the business relationship.

69.     Defendants' material non-disclosures proximately caused injury to Plaintiff.

70.     Plaintiff was seriously injured as a result of the non-disclosure fraud to the extent as set forth in in paragraph 48 above.

71.     Defendants are liable for Non-Disclosure Fraud.

## COUNT FOUR
## VIOLATION OF TEXAS DECEPTIVE TRADE PRACTICES – CONSUMER PROTECTION ACT

72.     Plaintiff reallege every allegation set forth in paragraphs 1 through 71 and incorporates those allegations by reference.

73.     Plaintiff is a consumer under the provisions of the Texas Deceptive Trade Practices – Consumer Protection Act ("DTPA"). Tex. Bus. & Com. Code Ann. § 17.45.

74.     Defendants participated in trade and commerce with Plaintiff within the State of Texas in which Defendants advertised and invited Plaintiff to participate in goods and services and promised to provide liquidity pool management and services on behalf of Plaintiff and the other liquidity partners.

75.     The DTPA applies to the actions of Defendants and their conduct falls within the scope of the DTPA.

76.     Defendants conduct as set forth herein is in violation of multiple provisions of the DTPA. Defendants' conduct consists of false, misleading, or deceptive acts and/or practices.

77.     Specifically, and particularly, Defendants have violated the following provisions of the DTPA by:

a.  Engaging in deceptive advertising in violation of Tex. Bus. & Com. Code Ann. § 17.12 by disseminating statements that knowingly materially misrepresented the terms, conditions, and character of the liquidity pool accounts.

b.  Making knowingly material misrepresentations for the purpose of inducing Plaintiff to enter into the Agreement. § 17.12(2).

c.  Using deceptive representations or designations of geographic origin in connection with goods or services regarding the locations (virtually and physically) of Defendants' services, the liquidity pools, and the wallets. § 17.46(4).

d.  Representing that goods or services have sponsorship, uses, benefits, or quantities which they do not have regarding the liquidity pools, Agreement, and services of Defendants. § 17.46(5).

e.  Representing that a person has a sponsorship, approval, status, affiliation, or connection which the person does not regarding Sanciangco's affiliation and support by the Ruby Family Office § 17.46(5).

f.  Advertising goods or services with intent not to sell them as advertised. § 17.46(9).

g.  Representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law. § 17.46(12).

78.    Plaintiff has been injured by the false, deceptive, and misleading acts and practices of Defendant set forth in the previously incorporated paragraphs. Defendants' false, misleading, and deceptive practices deceptive are the proximate cause of Plaintiff's injuries.

79.    Upon information and belief, Defendants knowingly committed the actions enumerated above.

80.    Plaintiff is entitled to recover three times the actual damages suffered by Plaintiff, together with prejudgment and post judgment interest as allowed by law, and reasonable attorney's fees.

## COUNT FIVE
## CONVERSION

81.    Plaintiff reallege every allegation set forth in paragraphs 1 through 80 and incorporates those allegations by reference.

82.    Defendants wrongfully took and deprived Plaintiff of lawful possession of more than $75,000.00 and converted it for their own use. The property was converted without Plaintiffs' knowledge or consent.

83.    Plaintiff was, at the time of the conversion, the lawful owner of the converted property. Defendants, conversely, had absolutely no right or title to, or interest in, the property, and has wholly failed to compensate Plaintiff for the property.

84.    Plaintiff demanded that Defendants turn possession of the property over to Plaintiff, but Defendants have refused.

85.    Plaintiff has been damaged as the result of Defendants' conversion.

86.    Plaintiff has been injured by the actions of Defendants.

87.    Defendants are liable for conversion under Texas law.

88.    Based on the facts more specifically described above in the previously incorporated paragraphs, Defendants purposefully acted in a way to commit Conversion against Plaintiff.

## COUNT SIX
## NEGLIGENT MISREPRESENTATION

89.     Plaintiff realleges every allegation set forth in paragraphs 1 through 88  and incorporates those allegations by reference.

90.     Defendants owed Plaintiff a legal duty to not make misrepresentations or to make omissions of material fact.

91.     As set forth above, Defendants made multiple misrepresentations and omissions of material facts. These misrepresentations and omissions breached their duties to Plaintiff.

92.     The misrepresentations and omissions were, at a minimum, negligent.

93.     Defendants' breach proximately caused damages to Plaintiff.

## COUNT SEVEN
## NEGLIGENCE

94.     Plaintiff realleges every allegation set forth in paragraphs 1 through 93 and incorporates those allegations by reference.

95.     In addition to, or in the alternative to the intentional torts pled, and the breaches of contract pled above, Defendants were negligent in their handling of the Fees and the liquidity pool.

96.     Defendants owed Plaintiff a duty of care in administering the liquidity pool and managing the payment of fees.

97.     Defendants breached their most important and basic duty owed to Plaintiff when they failed to provide the Funds and instead kept the Funds and caused significant damage to Plaintiff.

98.     Defendants' breach of its duty is the direct, actual, and proximate cause of injuries to Plaintiff.

99.     Plaintiff has been severely injured by Defendants' negligence as set forth specifically in this Complaint.

100.     Defendants are liable for negligence.

**COUNT EIGHT**
**UNJUST ENRICHMENT**

101.     Plaintiff realleges every allegation set forth in paragraphs 1 through 100 and incorporates those allegations by reference.

102.     Defendants, individually and jointly, have acted in a way so as to unjustly and illegally deprive Plaintiff of profits and value to each of the Defendants' own benefit.

103.     As a result of Defendants' unlawful and deceptive actions described in this Complaint, Defendants were enriched at the expense of the Plaintiff through their failure to pay fees and return placed cryptocurrency to Plaintiff.

104.     It is unequitable and unconscionable to permit Defendants to retain the ill-gotten benefits that they received from Plaintiff.

105.     Defendants are liable for unjust enrichment.

**COUNT NINE**
**TREBLE DAMAGES**

106.     Plaintiff realleges every allegation set forth in paragraphs 1 through 105 and incorporates those allegations by reference.

107.     Defendants' fraudulent, tortious actions have been known, intentional, willful, malicious, and in bad faith.

108.     Plaintiff is entitled to treble damages against Defendants pursuant to the Texas Deceptive Trade Practices – Consumer Protection . Tex. Bus. & Com. Code Ann. § 17.50.

**COUNT TEN**
**PUNITIVE DAMAGES**

109.    Plaintiff realleges every allegation set forth in paragraphs 1 through 108 and incorporates those allegations by reference.

110.    Defendants' fraudulent, tortious actions have been known, intentional, willful, malicious, and in bad faith.

111.    Punitive damages may be levied against defendant to punish defendant for outrageous, malicious, or otherwise morally culpable conduct. (*Ellis Cnty. State Bank v. Keever*, 936 S.W.2d 683 (Tex. App. 1996)).

112.    In addition to, or in the alternative to treble damages, Plaintiff is entitled to punitive damages against Defendants.

**COUNT ELEVEN**
**ATTORNEYS' FEES**

113.    Plaintiff realleges every allegation set forth in paragraphs 1 through 112 and incorporates those allegations by reference.

114.    Defendants' fraudulent, tortious actions have been known, intentional, willful, malicious, and in bad faith.

115.    Plaintiff is entitled to Attorneys' fees, costs, and expenses of litigation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands a jury trial on all claims so triable and judgment as follows:

1.    That each Defendant be served with process and made to answer this Complaint;

2.    A trial by jury;

3.       Awarding total fees due to Plaintiff in an amount to be determined at trial but in any event not less than $4,400,000;

4.       Awarding any and all damages, including, compensatory, general, nominal, and punitive and exemplary damages against the Defendants, jointly and severally, as allowed by law in an amount of at least $75,000;

5.       Awarding treble damages against the Defendants, jointly and severally, pursuant to applicable laws including but not limited to the Texas Consumer Protection Act in an amount to be determined at trial;

6.       Awarding Plaintiff additional punitive damages against Defendants, jointly and severally;

7.       Awarding attorneys' fees against the Defendants jointly and severally, pursuant to applicable laws including but not limited to the DTPA, in an amount to be determined at a later date;

8.       Awarding pre-judgment interest at the maximum rate permitted, against the Defendants, jointly and severally;

9.       Awarding post-judgment interest at the maximum rate permitted against the Defendants, jointly and severally; and

10.     Awarding such other relief as this Court deems just and proper against the Defendants, jointly and severally.

*EXECUTION NEXT PAGE*

RESPECTFULLY SUBMITTED this the 24th day of January, 2023.

**BARHAM & MAUCERE LLC**

*/s/ SCOTT RAYMOND MAUCERE*
_____
Scott R. Maucere, TX # 24127853
Admitted to Practice in U.S. District Court
For the Northern District of Texas
6708 Heritage Business Court
Chattanooga, TN 37421
423.855.1755
Scott@b-m.law
*Attorney for the Plaintiff*

**MALONE FROST MARTIN PLLC**

*/s/ XERXES MARTIN*
_____
Xerxes Martin TX # 24078928
Admitted to Practice in U.S. District Court
For the Northern District of Texas
8750 N. Central Expressway
Northpark Central, Suite 1850
Dallas, Texas 75231
214.346.2630
xmartin@mamlaw.com
*Attorney for the Plaintiff*